## Commonwealth vs. Tobin V. Kerns.

Suffolk. February 8, 2007. - August 9, 2007.

Present: Marshall, C.J., Greaney, Spina, Cowin, & Cordy, JJ.

*Threatening. Conspiracy. Evidence,* Threat, Conspiracy, Acts and declarations of conspirator. *Practice, Criminal,* Interlocutory appeal. *Supreme Judicial Court,* Appeal from order of single justice.

Although a single justice of this court did not abuse his discretion in denying the Commonwealth's petition pursuant to G. L. c. 211, § 3, seeking relief from an unfavorable ruling regarding the law that the judge in a jury-waived criminal trial would apply, in that the single justice did not have the benefit of a transcript of the conference at which the applicable law was discussed, this court, in an appeal from that ruling pursuant to S.J.C. Rule 2:21, concluded that the substantive issue should be considered, where the single justice had entered a stay in the matter, it appeared certain that no decision by the judge would be forthcoming absent a decision by this court, and the record presented to this court (including the conference transcript) demonstrated that, without guidance from this court, the judge intended to instruct himself — incorrectly — on an important point of law. [649-651]
This court concluded that the plain language of G. L. c. 269, § 14 (*b*) (1), making criminal the communication of any threat that a deadly, dangerous, or destructive device, substance, or item is or will be present or used at a specified place or location, does not encompass a requirement that the person to whom the threat is communicated be a potential target of the threatened crime, but may not be read so broadly as to include words exchanged between coconspirators or coventurers [651-655]; thus, at a criminal trial, the Commonwealth's evidence that the defendant was an integral member of a core group of friends who plotted to use firearms and deadly explosives to kill students, teachers, resource officers, and administrators at a high school on a specific date, and that the defendant, by himself or with another, communicated the plan to people outside the core group, if believed, was sufficient to support a finding that the defendant had violated G. L. c. 269, § 14 (*b*) (1) [655-656].

Civil action commenced in the Supreme Judicial Court for the county of Suffolk on October 19, 2006.

The case was heard by *Ireland,* J.

*Gail M. McKenna,* Assistant District Attorney (*John Mc-*

*Laughlin,* Assistant District Attorney, with her) for the Commonwealth.

*William McElligott* for the defendant.

*William R. Keating,* District Attorney for the Norfolk District, & *Tracey A. Cusick,* Assistant District Attorney, for District Attorney for the Norfolk District, amicus curiae, submitted a brief.

*Daniel F. Conley,* District Attorney for the Suffolk District, & *John P. Zanini* & *Kristin Lomard O'Donnell,* Assistant District Attorneys, for the District Attorney for the Suffolk District & others, amici curiae, submitted a brief.

GREANEY, J. The defendant, indicted as a youthful offender, is on trial before a judge in the Brockton Division of the Juvenile Court Department, sitting without a jury, on charges of threatening to use deadly weapons, G. L. c. 269, § 14 (*b*); and conspiracy to commit mass murder, G. L. c. 274, § 7.[1] The charges arose out of allegations that the defendant, and others, planned to execute a terrorist-type attack on students, teachers, resource officers, and administrators at Marshfield High School (high school). The evidence at the trial has been completed, closing arguments made, and the judge has taken the case under advisement pending a decision by this court. The issues (here by way of the Commonwealth's appeal from a judgment in the county court) concern whether the Commonwealth properly sought relief from a single justice of this court under G. L. c. 211, § 3, from midtrial statements made by the judge about the law that he would apply to the communication element of the charge of threatening to use deadly weapons, G. L. c. 269, § 14 (*b*)[2]; and whether a conviction under that statute requires proof that the defendant, directly or indirectly, communicated the threat to a potential victim of the threatened crime. We

---

[1]The judge has entered a required finding of not guilty on a third charge against the defendant, that of promoting anarchy, G. L. c. 264, § 11.

[2]General Laws c. 269, § 14 (*b*), as appearing in St. 2002, c. 313, § 12, an emergency act, states:

> "Whoever willfully communicates or causes to be communicated, either directly or indirectly, orally, in writing, by mail, by use of a telephone or telecommunication device including, but not limited to, electronic mail, Internet communications and facsimile communications, through an electronic communication device or by any other means, a threat: —

conclude that relief under G. L. c. 211, § 3, was available to the Commonwealth, and that the communication element of G. L. c. 269, § 14 (*b*), may be proved by evidence that the threat was communicated to any person (other than a coconspirator or co-venturer), and the communication need not be made to an intended target or potential victim.

We summarize the Commonwealth's evidence relevant to the charge of G. L. c. 269, § 14 (*b*) (omitting details unnecessary to decide the substantive issue raised), and the events concerning its petition under G. L. c. 211, § 3.

a. During the month of December, 2003, a junior at the high school, Joseph Nee, asked a schoolmate and longtime friend, Daniel K. Farley, "Wouldn't it be funny if I shot up [the high school]?" Three weeks later, Nee mentioned the idea again to Farley, asking, "Would you be interested in shooting up [the high school] with me?" The defendant, who was a sophomore at the high school, was present at the time, but said nothing. A few weeks later, Nee reasserted to Farley and the defendant that he wanted to shoot up the school. This time, the defendant indicated that he might be interested in such a plan. Over the next few months, Nee (who was seventeen or eighteen years of age), Farley (who was sixteen or seventeen years of age), the defendant (who turned sixteen years old in April, 2004), and another schoolmate, Joseph Sullivan (who was fifteen years old), frequently discussed the specifics of a plan whereby the four friends would enter the high school building around dismissal time, armed with automatic and semiautomatic weapons,

"(1) that a firearm, rifle, shotgun, machine gun or assault weapon, as defined in [G. L. c. 140, § 121], an explosive or incendiary device, a dangerous chemical or biological agent, a poison, a harmful radioactive substance or any other device, substance or item capable of causing death, serious bodily injury or substantial property damage, will be used at a place or location, or is present or will be present at a place or location, whether or not the same is in fact used or present; or

"(2) to hijack an aircraft, ship, or common carrier thereby causing anxiety, unrest, fear, or personal discomfort to any person or group of persons shall be punished by imprisonment in the state prison for not more than 20 years or imprisonment in the house of correction for not more than 2½ years, or by fine of not more than $10,000, or by both such fine and imprisonment."

explosives, and homemade napalm. They planned to line the halls with napalm and padlock the exit doors with bicycle locks to prevent any person from escaping. The four then planned to shoot, and in some cases torture, specific individuals whom they had preselected as targets (the principal, two assistant principals, a physical education teacher, a resource officer, and several male athletes). Nee and the defendant also spoke about using explosives to blow up two gasoline stations in Marshfield, simultaneously, thereby diverting attention of law enforcement authorities and affording them more time at the high school until the police arrived. The plan was to take place on April 15, 2005.[3] Farley and Sullivan considered Nee to be the originator of the plan,[4] and Nee referred to the plan as his "baby." The defendant contributed ideas for "tactical maneuvers" such as "rigging" explosives. The four called themselves the "Natural Born Killers" or "NBK."[5]

From time to time during the spring of 2004, the four attempted, with minimal success, to make working pipe bombs, napalm, and explosives. Nee cracked open fireworks in order to collect gunpowder to be used for making pipe bombs, and the defendant once filled a plastic container of gasoline with bits of styrofoam to reproduce an inflammable substance similar to napalm. The defendant wanted Nee to obtain guns, and Nee assured the others that he knew where they could be purchased. The four conducted extensive Internet research on the availability and types of weapons, especially handguns and semiautomatic firearms. The defendant showed Farley and Sullivan video footage of the Columbine killings on the computer in his father's office at his home. Although Nee, on at least two

---

[3]A target date of April 20 was originally chosen, that date being the anniversary of both Adolph Hitler's birthday and the highly publicized 1999 shootings at Columbine High School in Colorado. Because that date fell during school vacation, however, Nee and the defendant settled on April 15.

[4]Daniel Farley testified that Nee had an alternate plan, to be executed if the school shootings failed, in which the four would go to the targeted victims' homes at night and kill them. Joseph Sullivan testified that the alternate plan was the defendant's. Timothy Courchene, a friend of Nee and the defendant, testified that he believed the plan to murder people in their homes was Farley's plan.

[5]"Natural Born Killers" is the title of a 1994 movie about a couple who embarked on a killing spree.

occasions, tried to obtain firearms from other students at the high school, none of the four ever acquired an actual firearm. Nee, Farley, Sullivan, and the defendant practiced shooting, however, at various times using Nee's BB gun, and targeted parts of a tree pretending it to be a human form. The defendant warned that anyone who exposed the plan to others would have his "tongue cut out of his head."

On separate occasions during the spring of 2004, Nee and the defendant approached two other friends, Kyle Kimmett and Timothy Courchene, and discussed with them (at separate times) the specifics of their plan.[6] Kimmett testified that he twice was asked to join the NBK, and participate in the plan, during the 2003-2004 school year. Kimmett understood the defendant to be the plan's leader. Nee and the defendant told him that they planned to cause chaos in the school and wanted to recruit Kimmett to act in the role of "enforcer." Kimmett informed Nee and the defendant that he did not want any part of the plan. He testified that, at the time, he thought that they could not be serious and that the plan was a "stupid little high school drama."

Courchene testified that Nee and the defendant described to him what would happen at the high school on April 15, 2005, and showed him a list of specific people who would be among those killed. The list shown to Courchene included the principal, an assistant principal, the school resource officers, and several seniors whom Nee did not like. Nee told Courchene that, if he wanted to take part in the plan, he should "lay low," "be good," and "do what you have to do," so that "nobody suspects anything." Courchene told Nee and Farley that he did not want anything to do with the plan. Nee warned Courchene: "If any rats were to form, then they would have their tongues cut out." The other three repeated that sentiment to Courchene. Courchene testified that he was "freaked out" and "scared" by what had been said.

---

[6]The Commonwealth presented a third witness, Carrie Cullivan, who testified that during August of 2004, she overheard Nee and Farley discussing something. Sullivan was present at the time, but said nothing. When she asked Nee and Farley what they were talking about, they first responded that they could not tell her. Farley then said that "once they wanted to and were thinking about blowing up the school" to get back at the people who teased them when they were younger. The defendant was not present, and his name was not mentioned on that occasion.

In May, 2004, Nee moved out of his home (because of conflict with his father) and lived for one month at the defendant's home. In the beginning of June, the defendant was admitted to a psychiatric hospital.[7] On his release, the defendant appeared different: he had a new hairstyle (no longer sporting a shaved head) and wore clothes of a lighter color (rather than black). Farley had no contact at all with the defendant over the summer of 2004. Nee expressed to Sullivan his concern whether the defendant still wanted to participate in the plan.

On September 16, 2004,[8] Nee, Farley, and Sullivan met with two high school resource officers and two Marshfield police officers and told them about the plan. In describing the plan, the three admitted some involvement, but Nee (who did most of the speaking) ascribed responsibility for the plan's design, and the method of its execution, to the defendant. The defendant was arrested the following day,[9] and Marshfield police officers, with a warrant and with his father's consent, conducted a search of the defendant's home. During the search, the police seized, among other things, PVC piping and a notebook containing a list of weapons (in the defendant's handwriting), pictures and information on weapons and explosives, and two hand-drawn maps of the high school. A computer seized from the room in which Nee had slept while living at the defendant's home (which was next door to the defendant's bedroom) contained materials relating to the Columbine shootings, video files and information on weapons and explosives, and downloaded text from "The Anarchist's Cookbook."[10]

---

[7]The defendant's father, testifying for the defense, explained that his son spent one week at an adolescent crisis center, and three weeks thereafter at an acute residential treatment center for adolescents. The defendant was hospitalized, his father testified, for treatment of stress and anxiety (which had intensified during the month Nee had been living with them) and because of general suicide concerns.

[8]During cross-examination, Farley testified that days earlier, the defendant and Nee had been involved in an argument that resulted in an exchange of physical blows.

[9]Nee was arrested sometime in October, 2004, and charged, as an adult, with various offenses.

[10]"The Anarchist's Cookbook" is an instructional book, first published in 1967, which contains information and recipes for producing homemade bombs, explosives, and other dangerous items.

The defendant was indicted on October 25, 2004, as a youthful offender on charges of promotion of anarchy; threatening to use deadly weapons; and conspiracy (with Nee) to commit mass murder. The case proceeded to a trial, which began on October 16, 2006.

b. At the close of the Commonwealth's evidence, the judge entered a required finding of not guilty on the charge of promotion of anarchy, and denied the defendant's motions for required findings on the charges of conspiracy and threatening to use deadly weapons. During a conference on the merits of the motions, the Commonwealth and the defendant expressed differing views on the proper interpretation of the communication element of the offense of threatening to use deadly weapons. The defendant's position was (and is) that a conviction under the statute requires proof that the threat was communicated to a targeted individual, or intended victim, of the alleged plot. The Commonwealth, on the other hand, argues that it is sufficient to show that the communication was made to any person, even if that person happens to be a coconspirator.

The judge acknowledged the significance of the dispute, noting that the Commonwealth had presented no evidence to suggest that the defendant ever communicated a threat to an intended victim. The judge stated that he was open to further arguments from the Commonwealth, but he indicated that, barring persuasive arguments, he intended to instruct himself on the law pertinent to threats, G. L. c. 275, § 2, which requires either direct, or indirect, communication of the threat to the intended victim or victims. The judge stated: "I have to say I'm not sold on the notion that just because [the defendant] detailed or talked about the plan with other potential participants or recruits that amounts to communication either because I don't think that is what the statute reads. So anyway, that would be my ruling, that I would note the Commonwealth's objection and [it] will stand in evidence."[11] The judge denied the Com-

---

[11]We have the benefit of the transcript of the conference in which the judge's ruling (just quoted) appears. The single justice did not have the transcript when he acted on the Commonwealth's petition for relief under G. L. c. 211, § 3. The lack of a transcript made the single justice's decision all the more difficult, as we shall point out shortly in this opinion.

monwealth's request for a stay of the trial proceedings so that the disputed issue could be clarified, and the trial continued with the presentation of the defendant's evidence.

The Commonwealth promptly filed a petition for relief pursuant to G. L. c. 211, § 3, requesting that the judge be advised to instruct himself in accordance with the law. The Commonwealth also filed a motion seeking to stay the proceedings until its G. L. c. 211, § 3, petition could be heard on the merits. At the end of the defendant's evidence, and after closing arguments, the judge acknowledged, on the record, that the Commonwealth had requested the county court to schedule a hearing before a single justice, in order to obtain guidance on the proper interpretation of the communication element of G. L. c. 269, § 14 (*b*). The judge expressed concern that there was no way to know if, when, or how such a hearing would take place. Stating, "I guess [it] is all a little bit up in the air from my particular standpoint," the judge announced his intention to await the decision of the single justice (and now this court) before rendering a decision on either of the remaining charges against the defendant.

The defendant filed a response in opposition to the Commonwealth's petition for relief, asserting that there had been no actual order or ruling by the judge that was contrary to the Commonwealth's position on the applicable law; that the Commonwealth had had ample opportunity to address the issue during the two years that had elapsed between indictment and the beginning of trial; and that addressing the issue at this late stage would be prejudicial to the defendant. The single justice denied the Commonwealth's G. L. c. 211, § 3, petition, without a hearing. The Commonwealth appealed from the single justice's ruling, pursuant to S.J.C. Rule 2:21, as amended, 434 Mass. 1301 (2001). The single justice allowed the Commonwealth's motion for a stay of the Juvenile Court proceedings to enable the Commonwealth to pursue its petition for relief. We allowed the Commonwealth's appeal to proceed, and the case was scheduled for oral argument. After hearing arguments, we allowed the parties to submit supplemental briefs, and we invited the filing of amicus briefs addressing whether the Commonwealth's use of G. L. c. 211, § 3, as a way to seek relief

from an unfavorable ruling or order during an ongoing criminal trial is appropriate. We turn first to the procedural issue.

1. The defendant argues, as he did before the single justice, that the Commonwealth should not receive G. L. c. 211, § 3, review because (1) the judge never made a ruling on what law he would apply to decide whether the communication element of the threatening charge had been proved; (2) the discussion about the applicable law occurred midtrial and resort by the Commonwealth to G. L. c. 211, § 3, during an ongoing trial is disruptive and contrary to the efficient administration of justice; and (3) the Commonwealth waived its right to raise the issue of applicable law, because it could have sought a decision on the question before trial by filing a motion to clarify the issue or by requesting a pretrial conference. See *Commonwealth* v. *Bell*, 442 Mass. 118, 122 (2004); *Commonwealth* v. *Yelle*, 390 Mass. 678, 687 (1984). The basis for the single justice's decision not to entertain the Commonwealth's petition is not in the record. He was not required to state a reason.

We do not consider that the single justice abused his discretion in denying the Commonwealth's petition, in view of the fact that he did not have a transcript of the conference at which the applicable law was discussed. See note 11, *supra.* The question whether the judge had made a ruling on what law he would consider (as distinguished from his just expressing general observations on the law of threats to clarify his thinking on the issue before finally determining the governing law) was hotly disputed. While a party may seek emergency relief under G. L. c. 211, § 3, from an adverse ruling or order occurring during an ongoing trial, the Commonwealth should understand that a single justice will not ordinarily err if he or she denies the petition, when it appears that facts and procedures critical to an informed decision cannot be ascertained with clarity and the efficient resolution of the trial may be disrupted by delay at the appellate level.[12] Such appears to have been the situation here.

---

[12]The effort to resolve the substantive issue raised by the Commonwealth in this case has disrupted the ongoing trial, a disruption that may be of consequence to the defendant, who was a juvenile between fifteen and sixteen years of age when he allegedly committed the crimes charged and now is, legally, an adult.

The Commonwealth could not have anticipated the judge's ruling and, as a

When similar situations occur, deference by the single justice to the action of the trial judge will likely be the norm and not the exception.

In this case, however, a stay has been entered, and it appears certain that no decision by the judge, on either charge against the defendant, will be forthcoming absent a decision by the full court. Further, the record now presented by the Commonwealth (and the defendant's response) demonstrates that, without guidance from this court, the judge intends to instruct himself — incorrectly — on an important point of law.[13] The crime charged against the defendant, under G. L. c. 269, § 14 (*b*), is serious. The Commonwealth's evidence, if accepted, shows a dangerous plot to cause death, injury, and destruction at a public school. A misconstruction of the communication element of G. L. c. 269, § 14 (*b*), could lead to a wrongful acquittal of the defendant from which the Commonwealth would have no remedy.[14] We appreciate as well that the governing law on the communication element of G. L. c. 269, § 14 (*b*), is in need of correct formulation, and that the issue has been thoroughly briefed and, if not decided, will likely arise again. For all these reasons, we conclude that the substantive issue should be decided. See *Com-*

result, could not have raised the issue before trial by seeking a pretrial ruling. If this could have been done, it would have enabled the single justice to study the issue in more detail without the pressure for immediacy that is present when G. L. c. 211, § 3, relief is sought during an ongoing trial. We note that, in many cases, where a pretrial ruling has been sought by either the Commonwealth or the defendant and a ruling has been made by the judge, a single justice, considering a G. L. c. 211, § 3, petition may, if the issue is serious or novel, choose to report the issue to the full court. See, e.g., *Commonwealth* v. *Bing Sial Liang*, 434 Mass. 131, 133 (2001); *Commonwealth* v. *Jenkins*, 431 Mass. 501, 504 n.7 (2000); *Commonwealth* v. *Vao Sok*, 425 Mass. 787, 788 (1997); *Commonwealth* v. *Perry P.*, 418 Mass. 808, 810 (1994).

[13]The judge's own statement of his intentions, set forth earlier in this opinion, provides a basis for this conclusion and undermines the accepted premise that a trial judge sitting without a jury is presumed, absent contrary indication, to have "correctly instructed himself" on the law. *Commonwealth* v. *Ortiz*, 431 Mass. 134, 141 (2000), quoting *Cummings* v. *National Shawmut Bank*, 284 Mass. 563, 568 (1933).

[14]The unavailability of any remedy for the Commonwealth is one of several distinguishing features between this case and *Home Sav. Bank* v. *Savransky*, 307 Mass. 601 (1940), an action in tort for negligence, which is mischaracterized in the defendant's brief as "almost directly on point" in support of his argument that the judge made no ruling that warrants G. L. c. 211, § 3, relief.

*monwealth* v. *Bell, supra*; *Villalta* v. *Commonwealth*, 428 Mass. 429, 431 (1998); *McGuinness* v. *Commonwealth*, 420 Mass. 495, 497 (1995).

2. In construing G. L. c. 269, § 14 (*b*) (1), we apply the well-settled rule that "[w]here the language of a statute is plain, it must be interpreted in accordance with the usual and natural meaning of the words." *Locator Servs. Group, Ltd.* v. *Treasurer & Receiver Gen.*, 443 Mass. 837, 846 (2005), quoting *Gurley* v. *Commonwealth*, 363 Mass. 595, 598 (1973). We look to the text of the statute, which, by its unambiguous language, see note 2, *supra*, requires that the Commonwealth prove beyond a reasonable doubt (1) that the defendant wilfully communicated, or caused to be communicated, a threat (2) to use or have present (3) one of an enumerated list of dangerous devices, substances, or items capable of causing death, serious bodily injury, or substantial property damage (4) at a place or location. The statute specifies no details with respect to potential victims, or even requires that there be potential victims. Read straightforwardly, the statute protects any "place or location" from threats that deadly, dangerous, or destructive weapons will be present or used, regardless of an actual ability or intention to carry out the threat. This understanding is supported by language contained in § 14 (*c*)[15] and (*d*).[16] Subsection (*c*) establishes a separate, more serious offense for the communication of a threat

---

[15]Section 14 (*c*) provides:

"Whoever wilfully communicates or causes to be communicated such a threat [as set forth in (*b*)] thereby causing either the evacuation or serious disruption of a school, school related event, school transportation, or a dwelling, building, place of assembly, facility or public transport, or an aircraft, ship or common carrier, or wilfully communicates or causes serious public inconvenience or alarm, shall be punished by imprisonment in the state prison for not less than 3 years nor more than 20 years or imprisonment in the house of correction for not less than 6 months nor more than 2 ½ years, or by fine of not less than $1,000 nor more than $50,000, or by both such fine and imprisonment."

[16]Section 14 (*d*) provides, in relevant part:

The court shall, after conviction, conduct a hearing to ascertain the extent of costs incurred, damages and financial loss suffered by an individual, public or private entity and the amount of property damage

prohibited by § 14 (*b*) that also causes an "evacuation or serious disruption" of, among other enumerated places, a school, dwelling, building, or public transport, or more generally "causes serious public inconvenience or alarm." Subsection (*d*) requires a judge, after a conviction under § 14 (*b*) or (*c*), to conduct a hearing to assess the extent of costs and financial damage resulting from the commission of the crime and to set an amount, and terms, of restitution to be paid by the defendant.

Reading the plain language of § 14 (*b*) in the context of the statute as a whole, and noting the fact that the date of the statute's emergency enactment was 2002 (one year after the September 11, 2001, terrorist attacks), we conclude that the Legislature intended to punish the communication of any threat that a deadly, dangerous, or destructive device, substance, or item is or will be present or used at a specified place or location. The offense does not encompass a requirement that the person to whom the threat is communicated be a potential target of the threatened crime.[17]

The defendant nevertheless contends that the judge should

> caused as a result of the defendant's crime. A person found guilty of violating this section shall, in all cases, in addition to any other punishment, be ordered to make restitution to the individual, public or private entity for any costs incurred, damages and financial loss sustained as a result of the commission of the crime. Restitution shall be imposed in addition to incarceration or fine . . . ."

[17]Although the defendant argues otherwise, language set forth in § 14 (*b*) (2) prohibiting the communication of a threat that results in "anxiety, unrest, fear, or personal discomfort to any person or group of persons" is applicable only to threats to hijack an aircraft, ship, or common carrier. This is true for three reasons: first, as matter of basic syntax, the element is set forth within subsection (2) and, therefore, qualifies only the type of threat listed directly beforehand in the same subsection; second, as explained above, a conviction under § 14 (*b*) (1) is possible in circumstances where there are no potential victims who would reasonably experience "anxiety, unrest, fear, or personal discomfort"; and third, it is inconceivable that the Legislature enacted § 14 (*b*) (1) intending that it not encompass threats to public safety, such as a bomb scare, communicated by letter, telephone, or electronic mail to authorities. The public may be unaware of a threat communicated thus (at least until cause for anxiety or fear has passed) and, therefore, would not be expected to experience "anxiety, unrest, fear, or personal discomfort." Our reasoning is reinforced by § 14 (*c*), which provides for additional penalties when threats prohibited by § 14 (*b*) result in "evacuation or serious disruption" of a location or "causes serious public inconvenience or alarm." The Legislature intended to draw a clear line

instruct himself according to the Massachusetts threat statute, G. L. c. 275, § 2, which makes it a criminal offense to "threaten[] to commit a crime against the person or property of another." We disagree. The term "threat" is undefined in that statute, but consistently has been understood as "an expression of intention to inflict a crime on another and an ability to do so in circumstances that would justify apprehension on the part of the recipient of the threat." *Commonwealth* v. *Sholley*, 432 Mass. 721, 725 (2000), cert. denied, 532 U.S. 980 (2001), quoting *Commonwealth* v. *Robicheau*, 421 Mass. 176, 183 (1995). See *Commonwealth* v. *Milo M.*, 433 Mass. 149, 154 (2001). See also *Commonwealth* v. *Chalifoux*, 362 Mass. 811, 816 (1973) (adopting said meaning of "threat" as first stated in *Robinson* v. *Bradley*, 300 F. Supp. 665, 668 [D. Mass. 1969]). The threat element of G. L. c. 275, § 2, has been interpreted to require that the communication be made to (or be intended to reach) the person who is the intended target of the threatened crime, so as to cause fear or apprehension in that person. See *Commonwealth* v. *Maiden*, 61 Mass. App. Ct. 433, 434 (2004), and cases cited.[18] The Appeals Court also has recognized that a defendant may be criminally responsible for making a threat to commit a crime, even when the threat fails entirely to reach its intended victim, so long as there is an intent to put the victim in imminent fear. See *Commonwealth* v. *Hughes*, 59 Mass. App. Ct. 280, 281-282 (2003) (construing threat component of G. L. c. 265, § 43 [*a*], in accordance with G. L. c. 275, § 2).[19]

While the above cases interpreting G. L. c. 275, § 2, may

---

between the offense of communicating a threat prohibited by § 14 (*b*) and the more serious offense of communicating a threat prohibited by § 14 (*b*) that also results in serious disruption of a location or generally causes public alarm. Were a successful conviction under § 14 (*b*) dependent on proof that the communicated threat also generated "anxiety, unrest, fear, or personal discomfort to any person or group of persons," a charge under § 14 (*c*) would be warranted in almost every case.

[18]Whether the threat was made in attending "circumstances that would justify apprehension" is measured by means of an objective standard. We do not require proof that the threat actually caused the victim of the threat to fear that the threatened crime or injury might be inflicted. See *Commonwealth* v. *Milo M.*, 433 Mass. 149, 151-152 (2001); *Commonwealth* v. *DeVincent*, 358 Mass. 592, 595 (1971).

[19]A slightly different approach is taken in the Model Jury Instructions for Use in the District Court § 5.03 (1995), which recommend that a judge

provide some guidance on the issue presented here, none is dispositive. One further observation supports this conclusion. Warrantless arrests are not authorized for the offense of threatening to commit a crime. Rather, G. L. c. 275, § 3, provides that a warrant for that offense may issue only after a complaint is filed by the person threatened, and then only after a judge (or magistrate) examines the sworn testimony of the complainant, and any witnesses, and determines that there is "just cause to fear that such crime may be committed." See *Commonwealth* v. *Jacobsen*, 419 Mass. 269, 271 (1995). By legislative design, thus, conviction under G. L. c. 275, § 2, requires proof that the threat was made in circumstances that, viewed objectively, could have caused the intended victim to fear that the defendant had both the intention and ability to carry out the threat. The language of G. L. c. 269, § 14 (*b*), on the other hand, evinces a legislative intent that conviction require only that a threat was communicated to use, or have present, certain weapons, devices, or items at a place or location, "whether or not the same is in fact used or present." The essential difference between the two statutes is this: under G. L. c. 275, § 2, threatening another with a crime against his person or property, in circumstances justifying belief in the threatener's ability and intent to carry out the crime, is the punishable crime; under G. L. c. 269, § 14 (*b*), the punishable crime is the communication of a threat that a deadly, dangerous, or destructive device, substance, or item will be used, or present, at a specified place or location, regardless whether such weapons are actually present or intended to be used. Put simply, G. L. c. 275, § 2, protects particular people and their possessions; G. L. c. 269, § 14 (*b*), protects places or

---

instruct a jury that, to establish the offense of threatening to commit a crime, the Commonwealth must prove beyond a reasonable doubt three elements:

> "First: That the defendant communicated to [the alleged victim] an intent to injure his [or her] person or property, now or in the future;

> "Second: That the injury that was threatened, if carried out, would constitute a crime; and

> "Third: That the defendant made the threat under circumstances which could reasonably have caused [the alleged victim] to fear that the defendant had both the intention and the ability to carry out the threat."

locations and, ultimately, the public. See generally G. L. c. 269 (entitled "Crimes Against Public Peace").

That being said, we decline the Commonwealth's invitation to read the communication element of G. L. c. 269, § 14 (*b*), so broadly as to include words exchanged between coconspirators or coventurers. To do so would render the statute's required element of communication essentially meaningless, for any plan to use, or have present, deadly, dangerous, or destructive weapons at a certain location would, a fortiori, be spoken about, multiple times, between persons plotting together to commit the threatened crime. This interpretation would make criminal the agreement to commit a criminal act, as in G. L. c. 274, § 7 (conspiracy to commit a crime), rather than the communication (to others) of a threat to use, or have present, deadly or dangerous weapons.

Having set forth the proper interpretation of the communication element of G. L. c. 269, § 14 (*b*), we return briefly to the Commonwealth's evidence in this case, cognizant that, "[w]hen a case is tried without a jury, the legal framework in which facts are to be found is not generally stated with the precision and amplitude of instructions to a jury [and] it is presumed that the judge as trier of fact applies correct legal principles." *Commonwealth* v. *Milo M.*, *supra* at 152, quoting *Commonwealth* v. *Colon*, 33 Mass. App. Ct. 304, 308 (1992). The Commonwealth presented evidence that the defendant, in the winter and spring of 2004, was an integral member of a core group of friends who plotted to use firearms and deadly explosives to kill students, teachers, resource officers, and administrators on April 15, 2005, at the high school, and to inflict extensive property damage there. The Commonwealth also presented evidence that the defendant, by himself or with Nee, communicated the plan to at least two people outside the core group composed of himself, Nee, Farley, and Sullivan.[20] We pass no judgment on whether the Commonwealth's evidence is credible or whether the evidence, when weighed against any credible evidence offered by the defendant (who presented the testimony of five witnesses and also testified, at great length, in his own defense), equates

---

[20]It would not be illogical to view Timothy Courchene and Kyle Kimmett also as potential targets of the alleged threat that was communicated to them. We do not rely on this logic.

with proof beyond a reasonable doubt. We conclude only that the Commonwealth's evidence, if believed, is sufficient to support a finding that the defendant violated G. L. c. 269, § 14 (*b*).

The judgment denying the Commonwealth's petition for relief under G. L. c. 211, § 3, is vacated. Judgment shall enter allowing the petition and directing the judge to instruct himself on the law of G. L. c. 269, § 14 (*b*), in accordance with what has been said in this opinion. The stay entered by the single justice is vacated, and the case is remanded to the Juvenile Court for further proceedings consistent with this opinion.

*So ordered.*